UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

JOHN ANDERSON )
      Petitioner, )
)
v. )
) Civil Action No. 04-12355-RGS
)
DAVID NOLAN et al, )
      Respondents )
)

## MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

On September 25, 1997, a Middlesex County (Massachusetts) grand jury returned a seven-count indictment against petitioner John Anderson on charges of assault with intent to murder, *Mass. Gen. L. c. 265, § 15, Indictment No. 97-1838-001, Defendant's Record Appendix, at 1*; assault and battery, *Mass. Gen. L. c. 265, § 13A, Indictment No. 97-1838-002, Defendant's Record Appendix, at 2*; assault and battery, *Mass Gen. L. c. 265, § 13A, Indictment No. 97-1838-00, Defendant's Record Appendix, at 3*; mayhem, *Mass. Gen. L. c. 265, § 14, Indictment No. 97-1838-004, Defendant's Record Appendix, at 4*; assault and battery by means of a dangerous weapon, *Mass. Gen. L. c. 265, § 15A(b), Indictment No. 97-1838-005, Defendant's Record Appendix, at 5*; assault and battery, *Mass. Gen. L. c. 265. § 13A, Indictment No. 97-1838-006, Defendant's Record Appendix, at 6*; and assault and battery, *Mass. Gen. L. c. 265, § 13A, Indictment No. 97-1838-007, Defendant's Record Appendix, at 7*. It was alleged that the charged offenses were committed on August 2, 1997. *Indictment Nos. 97-1838-001 through 97-1838-007. Defendant's Record Appendix, at 1-7.*

On August 25, 26, 27 and 30, 1999, a jury trial was conducted on the above charges.[1] On August 26, 1999, the Commonwealth filed nolle prosequi declarations as to *Indictment Nos. 97-1838-003* and *97-1838-007*. *Defendant's Record Appendix, at R. A. 41, 47*. As to *Indictment No. 97-1838-001*, charging assault with intent to murder, the jury found the petitioner not guilty. *Defendant's Record Appendix, at R. A. 35*. The jury found the petitioner guilty of the remaining charges. *Defendant's Record Appendix, at R. A. 36-39*. The petitioner was sentenced on August 30, 1999. *Trial Tr. Vol. IV, at 89-94; Defendant's Record Appendix, at R. A. 49*. As to the conviction for mayhem, *Indictment No. 97-1838-004*, the petitioner was sentenced to state prison for a term of not more than fifteen years and one day nor less than fifteen years. *Trial Tr. Vol. IV, at 93-94; Defendant's Record Appendix, at R. A. 49*. As to the conviction for assault and battery by means of a dangerous weapon, the petitioner was sentenced to state prison for a term of not more than ten years nor less than nine years, concurrent with the sentence as to *Indictment No. 97-1838-004*. *Trial Tr. Vol. IV, at 93; Defendant's Record Appendix, at R. A. 49*. The guilty findings as to *Indictment No. 97-1838-002* and *Indictment No. 97-1838-006* were placed on file without objection by the petitioner and, accordingly, were not subject to appeal. *Trial Tr. Vol. IV, at 94; Defendant's Record Appendix, at R. A. 49*.

On appeal, the Massachusetts Appeals Court vacated the conviction for assault and battery by means of a dangerous weapon, dismissed the indictment as to that charge, and affirmed the mayhem conviction. <u>Commonwealth v. Anderson</u>, 58 Mass. App. Ct. 117 (2003).

---

[1] (Trial Transcript, <u>Commonwealth</u> v. <u>Anderson</u>, No. 97-1838, Middlesex Superior Court, before Spurlock, J., dated August 25, 1999 (Volume I, pages 1-44); August 26, 1999 (Volume II, pages 1-136); August 27, 1999 (Volume III, pages 1-164); and August 30, 1999 (Volume IV, pages 1-95) (hereinafter, "*Trial Tr. Vol. (volume number), at (page number)*")

The Supreme Judicial Court of Massachusetts denied petitioner's application for further appellate review. Commonwealth v. Anderson, 439 Mass. 1108 (2003). The Supreme Court of the United States denied petitioner's petition for writ of certiorari. Anderson v. Massachusetts, 540 U.S. 1009 (2003).

The instant petition states three grounds for relief. First, in the Appeals Court and in the Supreme Judicial Court, petitioner raised the issue that the petitioner's right to effective assistance of counsel under the Sixth Amendment to the United States Constitution had been denied by his trial counsel's failure to request an available and materially significant jury instruction on intoxication: that the jury were permitted to consider evidence of petitioner's intoxication in deciding whether he possessed the required specific intent to maim or disfigure.

Second, in the Appeals Court and in the Supreme Judicial Court petitioner raised the issue that the petitioner's right to effective assistance of counsel under the Sixth Amendment had been denied by his trial counsel's materially substandard failure to file or litigate a motion to suppress statements allegedly made by petitioner while in police custody.

Third, in the Supreme Judicial Court petitioner raised the issue that the Appeals Court, in affirming the mayhem conviction, had addressed the intoxication instruction issue in a manner that effectively applied a conclusive presumption of specific intent, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## STATEMENT OF FACTS

### I. Absence of an Intoxication Instruction.

Petitioner's trial counsel submitted written requests for jury instructions. *Defendant's Record Appendix, at 12-34.* The trial judge considered these requested instructions prior to

instructing the jury. *See Trial Tr. Vol. IV, at 28-29.* The requests submitted by petitioner's trial counsel did not include a request for an instruction indicating to the jury that they were permitted to consider evidence of petitioner's intoxication in deciding whether the Commonwealth proved the specific intent element of mayhem[2] beyond a reasonable doubt. *See Defendant's Record Appendix, at 12-34.* Further, petitioner's trial counsel did not request such an instruction orally. *See Trial Tr. Vol. IV, at 28-29.*

The trial judge did not instruct the jury that they were permitted to consider evidence of petitioner's intoxication in deciding whether the Commonwealth proved the specific intent element of mayhem beyond a reasonable doubt. *See Trial Tr. Vol. IV, at 54-82.* Following the jury charge, petitioner's trial counsel indicated to the trial judge that he did not object to the jury instructions given by the trial judge. *Trial Tr. Vol. IV, at 82.*

The closing argument made by petitioner's trial counsel was devoted primarily to the assertion that petitioner lacked the specific intent required for convictions on the charges of assault with intent to murder and mayhem, due to petitioner's intoxication. *See Trial Tr. Vol. IV, at 37-49.*

---

[2] This element is "the specific intent to maim or disfigure." *Trial Tr. Vol. IV, at 75.* *See Mass. Gen. L. c. 265, § 14.*

The evidence at trial of petitioner's intoxication included the following. At 4:30 P.M. or 5:00 P.M. on August 1, 1997, petitioner and Rita Parks went to the home of Ms. Parks' Aunt Barbara for a period of time, then visited a friend of Ms. Park's Aunt Barbara in the same building. See *Trial Tr. Vol. III, at 88-89, 144*. Subsequently, Mr. Anderson and Ms. Parks went to a bar called "DKLV". *Id. at 89*. At DKLV, Rita Parks and Mr. Anderson each drank five or six draft beers. [6 possible beer drinks] See *id*. After spending one or two hours at DKLV, Mr. Anderson and Rita Parks went to Mr. Anderson's house, where they consumed a six pack of beer, each drinking an equal amount. [9 possible beer drinks] See *Trial Tr. Vol. III, at 90*. At approximately 8:00 P.M. or 8:30 P.M., petitioner and Rita Parks went to an establishment called "Highland Tap". *Id. at 90-91*. At Highland Tap, Mr. Anderson and Rita Parks "couldn't get served", so they went to an establishment across the street from Highland Tap called "Captain John's". *Id. at 91*. At Captain John's,[3] Mr. Anderson and Rita Parks finished a pitcher of beer, each consuming three twelve-ounce mugs of beer. [12 possible beer drinks] See *id. at 92*. See Commonwealth v. Anderson, supra, 58 Mass. App. Ct. at 122 n. 4. A friend of petitioner sent over an additional pitcher of beer. *Trial Tr. Vol. III, at 139*. At or around 1:40 A.M. on August 2, 1997, Officer Kevin Hawes placed the petitioner up against a police cruiser to control petitioner's movements. *Trial Tr. Vol. II, at 71-76*. During this time, Officer Kevin Hawes could detect an odor of alcohol on petitioner. *Id. at 71-76, 81-82*. Compare Commonwealth v. Anderson, supra, 58 Mass. App. Ct. at 121 (Sergeant Brendan Durkin, with Hawes the first to arrive on scene, detected an odor of alcohol); id., 58 Mass. App. Ct. at 121-122 (approximately

---

[3] Although the portion of the transcript pertaining to this information refers to "the Highland Tap" rather than "Captain John's", it is clear from the preceding testimony that the witness and counsel were referring to Captain John's. See *Trial Tr. Vol. III, at 91-92*.

5

five hours after the initial police encounter, Sergeant Joseph Murray detected a slight odor of alcohol).

At trial, the principal defense offered by petitioner's trial counsel was that because of petitioner's intoxication, petitioner did not possess the specific intent required for either the offense of mayhem or the offense of assault with intent to murder. See *Trial Tr. Vol. IV, at 41* ("The Commonwealth must prove beyond a reasonable doubt that John Anderson had the specific intent, I'm going to suggest to you, to either maim Glenn Tetrault or to murder Glenn Tetrault. I'm going to suggest to you, based on the evidence as I recall it, and again remember now, I'm John Anderson's advocate, that there was no specific intent. What you had was people who drank too much on that particular night."); *Trial Tr. Vol. IV, at 43-44* ("By the time they got to Captain John's they had at least ingested nine beers. When they got to Captain John's she says they got there around 8:30, 9:00, 9:30, whatever the time was under any set of circumstances. If we are to believe what she said, that she and John shared a pitcher of beer, and out of that pitcher of beer you get at least three more beers. So that would put her and John sort of in the area of nine to ten beers under any set of circumstances. And that a friend of John's ordered another pitcher of beer for her -- for them. I don't mean just for her, obviously, but for them, and that she couldn't remember whether or not during that period of an hour or two hours, or three hours, however long they were there, whether or not they consumed that other pitcher of beer. But I'm going to suggest to you, based upon the ingestion of beer that they had during the early evening, how quickly they consumed beer, I'm going to leave that up to you and sort of your conjecture as to whether or not they finished that other pitcher or whether or not there was more beer beyond that, having in mind that on one occasion they both had six beers in about an hour and on another

occasion in less than an hour they had three. So I'm going to let — that up to you as to whether or not there were more than that. Again, that's up to you. That's up to the inferences you have to draw based upon the amount of beer that they had."); *Trial Tr. Vol. IV, at 45* ("I'm going to suggest to you at that point in time John Anderson, having in mind all he's had to drink, that he worked all day, got in a real argument with Glenn Tetr[]ault, and they argued for a significant, I'm going to suggest to you, period of time while they were in that club."); *Trial Tr. Vol. IV, at 46* ("Everybody that testifies in this case has either had five or six beers, or ten beers, or twelve beers, or fifteen beers. There is nobody, there is nobody that comes in and testifies, but for the police officers, who hadn't been drinking. Everybody has been drinking. Everybody, I suggest to you, appeared to be intoxicated to some level or another. As Rita Parks says, 'I was buzzed.' She was buzzed the first or second hour she started drinking. Well what does that mean? 'Well I ain't falling down drunk.' Those were her words, but she was buzzed. As long as, I'm going to suggest to you, she doesn't fall down on the street or on the floor, she's not drunk. But I'm going to suggest to you that was the condition of Rita Parks, John Anderson. I'm also going to suggest to you that everybody else, including Glenn, certainly was drinking heavily in that place."); *Trial Tr. Vol. IV, at 47* ("You can use your own common sense as to what was actually going on in that barroom on that night. You can use your own common sense as to how much people were drinking, and you can use your own common sense as to the level of intoxication of all those parties on that night."); *Trial Tr. Vol. IV, at 48-49* ("But I'm going to suggest to you again, the Judge is really going to instruct you as to the words specific intent. Intent, real cognizance of that word and what it truly means, and really, I'm going to suggest to you, think of John Anderson and the amount of alcohol that he had on that particular night, and how the events

occurred. Quickly, this argument, I'm going to suggest to you, in that barroom. Then the argument then ensued outside. Then the fight that occurred outside. . . . Think of the alcohol, I'm going to suggest to you, that they all had ingested. Think of the hour, all of those kind of things. I think if you do that, if you listen to the Judge's instructions, I think you will come to the resolution that John Anderson is not guilty of assault with intent to commit murder, and John Anderson is not guilty of mayhem."). See also *Trial Tr. Vol. II, at 91-92* (cross-examination by petitioner's trial counsel of Officer Kevin Hawes regarding petitioner's intoxication); *Trial Tr. Vol. II, at 113-114* (cross-examination by petitioner's trial counsel of Sergeant Brendan Durkin regarding petitioner's intoxication), *Trial Tr. Vol. II, at 119* (cross-examination by petitioner's trial counsel of Officer Daniel Kennedy regarding the petitioner's intoxication); *Trial Tr. Vol. III, at 133-136, 138-139* (cross-examination by petitioner's trial counsel of Rita Parks regarding petitioner's intoxication); *compare Trial Tr. Vols. I-IV.*

## II. Failure to File or Litigate a Motion to Suppress Statements.

The petitioner was represented at the trial level by three different court appointed attorneys. Beginning at his arraignment on October 9, 1997, petitioner was represented by appointed counsel Joseph M. Shields, Esquire. *See Defendant's Record Appendix, at 41, 43.* Attorney Shields' representation of petitioner concluded on March 5, 1998. *See id., at 41, 44.* On March 5, 1998, the representation of petitioner was taken over by appointed counsel Michael J. Casey, Esquire. *See id.* Attorney Casey's representation of petitioner concluded on March 5, 1999. *See id., at 41, 46.* On March 5, 1999, the representation of petitioner was taken over by Frederick A. Busconi, Esquire, who served as petitioner's trial counsel. *See id., at 42, 46; Trial Tr. Vols. I-IV.*

The Middlesex Superior Court docket for this case indicates that on March 2, 1998, a date of April 29, 1998, was set for a "Motion to Suppress", *Defendant's Record Appendix, at 44;* and on April 8, 1998, a date of May 21, 1998, was set for a "Motion to Suppress", *id.;* and on May 21, 1998, a continuance was ordered to June 10, 1998. *Id.*

Despite the fact that at trial the Commonwealth introduced evidence of statements allegedly made by petitioner while petitioner was in police custody, *see, e.g., Trial Tr. Vol. II, at 75-76, 79-85*, following petitioner's consumption of a significant amount of alcohol, *see Trial Tr. Vol. III, at 89, 90, 92, 139*, no motion to suppress was ever filed in this case. *See Defendant's Record Appendix, at 43-50; Trial Tr. Vol. II, at 80-81, 132-133.* When the Commonwealth sought to introduce testimony regarding petitioner's alleged statements, petitioner's trial counsel objected. *Trial Tr. Vol. II, at 80.*

Over the objection of petitioner's trial counsel but without having ruled on a filed and litigated motion to suppress, the trial judge admitted into evidence the testimony of three different police officers as to statements allegedly made by petitioner while in police custody. *See Trial Tr. Vol. II, at 80, 82, 83-85* (testimony of Officer Kevin Hawes); *id. at 100-105* (testimony of Sergeant Brendan Durkin); *Trial Tr. Vol. III, at 14, 21, 23-26* (testimony of Sergeant Joseph Murray)). The substance of these alleged statements included the following: (1) that petitioner understood his Miranda rights, agreed to speak with police, and agreed to accompany the police to the Criminal Bureau, *Trial Tr. Vol. II, at 80, 100; Trial Tr. Vol. III, at 14;* (2) that as to a question regarding his sobriety, petitioner felt fine, knew where he was, and knew what he was doing, *Trial Tr. Vol. III, at 23;* (3) in response to a question as to whether he had been drinking, that petitioner had two beers earlier in the night and that petitioner had not been using drugs, *id.*

9

*at 21, 23*; (4) that while inside Captain John's somebody had stolen, or attempted to steal Rita Parks' purse, and that petitioner chased that person outside, and before petitioner could get to that person he was attacked by a group of people he did not know, *Trial Tr. Vol. II, at 82, 100*; (5) alternatively, that petitioner had been at Captain John's, and when they came out and they were walking away from Cupples Square on Pine Street, two men ran up behind them and one of these men stole Rita Parks' pocketbook, *Trial Tr. Vol. III, at 24*; (6) that petitioner had tackled one of the people responsible for stealing Rita Parks' pocketbook and that the other person began to kick petitioner and fight with petitioner and eventually the police showed up and arrested petitioner for some unknown reason, *id.*; (7) that when asked to describe the individuals who stole his girlfriend's pocketbook and with whom he had an altercation, petitioner could not describe them, *id. at 25*; (8) that petitioner did not notice Mr. Tetrault until the police pointed him out, *Trial Tr. Vol. II, at 83*; (9) that the fight had occurred, and blood had been splashed on petitioner, on the side of the Pine Street opposite from where a man observed to be severely injured lay on the sidewalk and where blood was located, *Trial Tr. Vol. II, at 101-102*; (10) that petitioner hadn't been on the side of the street where the severely injured man was located and that he didn't even know that the other person who had been injured was lying until the police pointed it out to him, *id. at 103-104*; (11) as to Mr. Tetrault (without having been told which side of the street Mr. Tetrault was on) that petitioner "never had a beef" with Mr. Tetrault and that he was never on that side of the street, and that he was never on the 16 Pine Street side of the street, *Trial Tr. Vol. III, at 24, 25*; (12) when told that he had not been told which side of the street Mr. Tetrault was on, that petitioner became angry and accused officers of putting words in his mouth, *Trial Tr. Vol. III, at 24-25*; (13) when told by an officer that he had already stated to another

officer that the victim had taken Rita Parks' pocketbook and that it was the victim he had the initial problem with, and that he was going after the victim at the time he was jumped by other people and then arrested, petitioner got angry, called the officer a liar, and stated that he never even saw the victim, *id. at 26*; (14) that petitioner never even saw the victim, *id. at 25*; (15) that the blood on petitioner and on petitioner's sneakers must have happened in the fight with Mr. Quirbach and did happen during the fight with Mr. Quirbach, *Trial Tr. Vol. II, at 83-84*; (16) that while petitioner was fighting with the group that he didn't know, that he had been helped by Carl Quirbach, *Trial Tr. Vol. II, at 100, 105*; (17) an absence of response when asked why petitioner was fighting Carl Quirbach if Quirbach had been helping him, *id. at 105*; (18) that the blood on petitioner's sneakers, his legs, his shorts, and his shirt, was his own blood, *Trial Tr. Vol. III, at 25*; (19) that petitioner had gotten the blood on him in the fight with five or six men and pointed out the area of the street where the fight had occurred, *Trial Tr. Vol. II, at 101*; (20) with regard to the issue of whether the blood was fresh or old, that it must have happened during the fight, that it was old and he didn't know where it came from, and that the blood on petitioner was "old blood", *Trial Tr. Vol. II, at 84-85, 104*; (21) that neither petitioner nor his girlfriend had been involved in the fight, *Trial Tr. Vol. II, at 104-105*.

When the Commonwealth sought to introduce these statements, petitioner's trial counsel objected. *Trial Tr. Vol. II, at 80*. At sidebar, when asked by the trial judge whether there was a motion to suppress statements in this case, Attorney Busconi responded, "Again, Judge, I wasn't here. It's part of my problem." *Trial Tr. Vol. II, at 80*. Subsequently, at sidebar, in response to the trial judge's placing on the record the absence of a filed motion to suppress, Attorney Busconi explained his lapse by stating, "I suspect -- You know, we all know that everybody

11

thought this case was going to be disposed of." *Trial Tr. Vol. II, at 132-133.*

During a sidebar conference regarding defense counsel's failure to file a motion to suppress statements, the trial judge stated,

> I'm just saying if I had known that would have – that was going to be taking place, I would have done some other things before we even impaneled a jury, but from everything that I saw in the folder when I looked at it, nothing tipped me off that there was an issue about his statements to the police officers or anything like that. I'll make sure they understand that rule about considering his statements. **Because again, they may consider that he was too drunk to have voluntarily made those – or rationally made those statements**. . . .

*Trial Tr. Vol. II, at 133 (emphasis added)*

At the time the petitioner was in police custody at the car, Officer Hawes could detect an odor of alcohol on the petitioner. *Trial Tr. Vol. II, at 81-82.* Subsequently, Officer Hawes observed Glenn Tetrault lying unconscious in a pool of blood on the sidewalk. *Id. at 75-78.* The petitioner had injuries to his face. *Tr. Vol. III, at 31.*

At the police station, it was observed that both of the petitioner's eyes were swollen and his face was welted. *See Trial Tr. Vol. III, at 16, 33* (testimony of Sergeant Joseph Murray, Lowell Police Department). The knuckles on both of the petitioner's hands were scraped and appeared to have been bleeding. *Id. at 16.* The petitioner also had a scrape to the area of one of his knees. *Id. at 34.* The petitioner "definitely had an injury to his nose." *Id. at 33.* The petitioner had injuries on his facial bones, most significantly in the area underneath both eyes. *Id.*

### III. The Appeals Court's Conclusive Presumption of Specific Intent.

The petitioner timely appealed his convictions to the Massachusetts Appeals Court, *see Defendant's Record Appendix, at R. A. 40, 49*, addressing, *inter alia*, multiple claims of

ineffective assistance of counsel under the Sixth Amendment and under Massachusetts law, *see Defendant's Brief, at 11-42*, including a claim of ineffective assistance of counsel based on trial counsel's failure to request the trial judge to instruct the jury that they were permitted to consider evidence of the petitioner's intoxication in deciding whether the Commonwealth proved beyond a reasonable doubt the specific intent element of mayhem, i.e., "the specific intent to maim or disfigure", see *Trial Tr. Vol. IV, at 75; Mass. Gen. L. c. 265, § 14. See Defendant's Brief, at 11-16*. The petitioner also argued, *inter alia*, that the petitioner's convictions should be reversed because of the trial judge's failure to instruct the jury *sua sponte* that they were permitted to consider evidence of the petitioner's intoxication in deciding whether the Commonwealth proved the specific intent element of mayhem beyond a reasonable doubt. *Defendant's Brief, at 42-45*.

Having "pause[d] in consideration of the amount of beer consumed by the petitioner throughout the evening", Commonwealth v. Anderson, supra, 58 Mass. App. Ct. at 122, 122 n. 4, the Appeals Court, "assume[d] hypothetically that an intoxication instruction was warranted." Id. at 122. The Appeals Court "further assume[d] hypothetically that omission of such an instruction was either the result of ineffective assistance of counsel, or unobjected-to judicial error." Id. Notwithstanding these assumptions, the Appeals Court determined, "we are not persuaded that, had such an instruction been given, it would have materially influenced the guilty verdict, or been of such effect, when applied to the trial evidence, to render it inferentially plausible that the jury's verdict on the mayhem charge would have been different." Id. The Appeals Court based this determination on (1) "evidence that, notwithstanding his alcohol consumption, the petitioner remained in control of his faculties – a cognitive affect from which a jury could further conclude that the petitioner was capable of forming the requisite specific intent to commit mayhem",

13

Commonwealth v. Anderson, supra, 58 Mass. App. Ct. at 123; (2) "the brutal nature of the assault", id. at 123; (3) "the severity of the resulting injuries", id.; and (4) the fact "that the trial judge twice instructed the jury concerning the requirement of finding specific intent as an element of proof on the mayhem offense, first at the beginning of the case and second in the final charge." Id. The Appeals Court emphasized the severity of the alleged assault and the resulting injuries. Id. at 123-124. The Appeals Court did not conclude that the evidence demonstrated that an intoxication instruction was not warranted. See id., 58 Mass. App. Ct. 117. Rather, as indicated supra, the Appeals Court "assume[d] hypothetically that an intoxication instruction was warranted." Id. at 122; see id. at 121-124.

## ARGUMENT

### I. Standards of Review.

Pursuant to 28 U.S.C. § 2254(d)(1),

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States . . . .

28 U.S.C. § 2254(d)(1).

"If a claim was not adjudicated on the merits in a state court proceeding, then the issue is reviewed de novo." Norton v. Spencer, 351 F.3d 1, 4-5 (1st Cir. 2003), cert. denied, 124 S. Ct. 2876 (2004).

The text of 28 U.S.C. § 2254(d)(1) "is fairly read simply as a command that a federal court not issue the habeas writ unless the state court was wrong as a matter of law or

unreasonable in its application of law in a given case." Williams v. Taylor, 529 U.S. 362, 385 (2000). "In sum, the statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Id., 529 U.S. at 389.

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, supra, 529 U.S. at 413).

## II. Ineffective Assistance of Counsel

The United States Supreme Court's holding in Strickland v. Washington, 466 U.S. 668 (1984), which was clearly established Federal law in 2000, see Williams v. Taylor, supra, 539 U.S. at 390, was therefore clearly established Federal law at the time petitioner's case was decided by the Appeals Court, see Commonwealth v. Anderson, 58 Mass. App. Ct. 117 (2003), at the time the Supreme Judicial Court of Massachusetts denied petitioner's application for further appellate review, see Commonwealth v. Anderson, 439 Mass. 1108 (2003), and at the time the United States Supreme Court denied petitioner's petition for writ of certiorari. See Anderson v. Massachusetts, 540 U.S. 1009 (2003). Accordingly, the merits of petitioner's claims of ineffective assistance of counsel under the Sixth Amendment "are squarely governed by [the United States Supreme Court's] holding in Strickland v. Washington, 466 U.S. 668 . . . (1984)."

15

See Williams v. Taylor, supra, 529 U.S. at 390; id. (to be "clearly established Federal law" under [28 U.S.C. 2254(d)(1)], the rule of Federal law must be "clearly established at the time [petitioner's] state-court conviction became final.").

Under Strickland, a violation of the constitutionally guaranteed right to the effective assistance of counsel has two components:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." [Strickland, supra, 466 U.S.] at 687.

Williams v. Taylor, supra, 529 U.S. at 390.

> To establish ineffectiveness, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." [Strickland, supra, 466 U.S.] at 688. To establish prejudice he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Williams v. Taylor, supra, 529 U.S. at 390-391.

The Sixth Amendment trial-level right to counsel, which comprehends the right to effective assistance of counsel, applies to the States through the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 392 (1985).

### A. Failure to Request an Intoxication Instruction.

The Appeals Court did not address the merits of petitioner's federal claim of ineffective assistance of counsel as to his trial counsel's failure either to request an intoxication instruction or to object to the trial judge's failure to give an intoxication instruction. See Commonwealth v. Anderson, supra. 58 Mass. App. Ct. 117. Accordingly, the issue is reviewed de novo. See