**UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **JOHN ANDERSON** ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No. 04-12355-RGS** |
| ) | |
| **DAVID NOLAN et al,** ) | |
| **Respondents** ) | |
| ) | |

**PETITIONER'S MEMORANDUM IN SUPPORT OF APPLICATION FOR A
CERTIFICATE OF APPEALABILITY**

Petitioner John Anderson respectfully moves that this Honorable Court grant him a

certificate of appealability (COA) pursuant to 28 U.S.C. § 2253.  Petitioner seeks a COA as to

this Court's dismissal of his habeas corpus petition.

In order for petitioner to be permitted to appeal his case to the United States Court of

Appeals for the First Circuit, this Court must grant him a "certificate of appealability" (COA)

under 28 U.S.C. § 2253.  The test for issuance of a COA is designed to weed out only the most

unworthy appeals.  Under the Supreme Court's interpretation of § 2253, this Court must grant

petitioner a COA if reasonable jurists could find the correctness of the dismissal of petitioner's

petition to be merely debatable: this is so even if the Court is completely convinced that it came

to the correct conclusion in dismissing petitioner's petition for a writ of habeas corpus.  See

Miller-El v. Cockrell, 537 U.S. 322, 338 (2003); 28 U.S.C. § 2253.

> A prisoner seeking a COA must prove "'something more than the absence of
> frivolity'" or the existence of mere "good faith" on his or her part, Barefoot[ v.
> Estelle, 463 U.S. 880 (1983)], supra, at 893.  We do not require petitioner to
> prove, before the issuance of a COA, that some jurists would grant the petition

1

for habeas corpus.  Indeed, a claim can be debatable even though every jurist
of reason might agree, after the COA has been granted and the case has received
full consideration, that petitioner will not prevail.

Miller-El v. Cockrell, supra, 537 U.S. at 338.

**I.   A COA should be granted because it is at least debatable that the failure of petitioner's trial counsel to request a jury instruction which would have permitted the jury to consider evidence of petitioner's intoxication in deciding whether the petitioner possessed the necessary mens rea to maim or disfigure constituted ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984).**

The evidence at trial of petitioner's intoxication included the following.  At 4:30 P.M. or 5:00 P.M. on August 1, 1997, petitioner and Rita Parks went to the home of Ms. Parks' Aunt Barbara for a period of time, then visited a friend of Ms. Park's Aunt Barbara in the same building.  See *Trial Tr. Vol. III, at 88-89, 144.*  Subsequently, Mr. Anderson and Ms. Parks went to a bar called "DKLV".  *Id. at 89.*  At DKLV, Rita Parks and Mr. Anderson each drank five or six draft beers. [6 possible beer drinks]  *See id.*  After spending one or two hours at DKLV, Mr. Anderson and Rita Parks went to Mr. Anderson's house, where they consumed a six pack of beer, each drinking an equal amount. [9 possible beer drinks]  *See Trial Tr. Vol. III, at 90.*  At approximately 8:00 P.M. or 8:30 P.M., petitioner and Rita Parks went to an establishment called "Highland Tap".  *Id. at 90-91.*  At Highland Tap, Mr. Anderson and Rita Parks "couldn't get served", so they went to an establishment across the street from Highland Tap called "Captain John's".  *Id. at 91.*  At Captain John's, Mr. Anderson and Rita Parks finished a pitcher of beer, each consuming three twelve-ounce mugs of beer. [12 possible beer drinks]  *See id. at 92.*  See Commonwealth v. Anderson, 58 Mass. App. Ct. 117, 122 n. 4 (2003).  A friend of petitioner sent over an additional pitcher of beer.  *Trial Tr. Vol. III, at 139.*  At or around 1:40 A.M. on August 2, 1997, Officer Kevin Hawes placed the petitioner up against a police cruiser to control petitioner's movements.  *Trial Tr. Vol. II, at 71-76.*  During this time, Officer Kevin Hawes

2

could detect an odor of alcohol on petitioner.  *Id.  at 71-76, 81-82.*  Compare Commonwealth v. Anderson, supra, 58 Mass. App. Ct. at 121 (Sergeant Brendan Durkin, with Hawes the first to arrive on scene, detected an odor of alcohol); id., 58 Mass. App. Ct. at 121-122 (approximately five hours after the initial police encounter, Sergeant Joseph Murray detected a slight odor of alcohol).

The principal defense at trial was that because of petitioner's intoxication he did not possess the specific intent required for either the offense of mayhem or the offense of assault with intent to murder, and the closing argument made by petitioner's trial counsel was devoted primarily to the assertion that petitioner lacked the specific intent required for convictions on the charges of assault with intent to murder and mayhem, due to petitioner's intoxication.  *See Trial Tr. Vol. IV, at 37-49; Trial Tr. Vol. IV, at 41* ("The Commonwealth must prove beyond a reasonable doubt that John Anderson had the specific intent, I'm going to suggest to you, to either maim Glenn Tetrault or to murder Glenn Tetrault.  I'm going to suggest to you, based on the evidence as I recall it, and again remember now, I'm John Anderson's advocate, that there was no specific intent.  What you had was people who drank too much on that particular night."); *Trial Tr. Vol. IV, at 43-44* ("By the time they got to Captain John's they had at least ingested nine beers.  When they got to Captain John's she says they got there around 8:30, 9:00, 9:30, whatever the time was under any set of circumstances.  If we are to believe what she said, that she and John shared a pitcher of beer, and out of that pitcher of beer you get at least three more beers.  So that would put her and John sort of in the area of nine to ten beers under any set of circumstances.  And that a friend of John's ordered another pitcher of beer for her –- for them.  I don't mean just for her, obviously, but for them, and that she couldn't remember whether or not during that period of an hour or two hours, or three hours, however long they were there, whether

or not they consumed that other pitcher of beer.  But I'm going to suggest to you, based upon the

ingestion of beer that they had during the early evening, how quickly they consumed beer, I'm

going to leave that up to you and sort of your conjecture as to whether or not they finished that

other pitcher or whether or not there was more beer beyond that, having in mind that on one

occasion they both had six beers in about an hour and on another occasion in less than an hour

they had three.  So I'm going to let –- that up to you as to whether or not there were more than

that.  Again, that's up to you.  That's up to the inferences you have to draw based upon the

amount of beer that they had."); *Trial Tr. Vol. IV, at 45* ("I'm going to suggest to you at that

point in time John Anderson, having in mind all he's had to drink, that he worked all day, got in

a real argument with Glenn Tetr[]ault, and they argued for a significant, I'm going to suggest to

you, period of time while they were in that club."); *Trial Tr. Vol. IV, at 46* ("Everybody that

testifies in this case has either had five or six beers, or ten beers, or twelve beers, or fifteen beers.

There is nobody, there is nobody that comes in and testifies, but for the police officers, who

hadn't been drinking.  Everybody has been drinking.  Everybody, I suggest to you, appeared to

be intoxicated to some level or another.  As Rita Parks says, 'I was buzzed.'  She was buzzed the

first or second hour she started drinking.  Well what does that mean?  'Well I ain't falling down

drunk.'  Those were her words, but she was buzzed.  As long as, I'm going to suggest to you, she

doesn't fall down on the street or on the floor, she's not drunk.  But I'm going to suggest to you

that was the condition of Rita Parks, John Anderson.  I'm also going to suggest to you that

everybody else, including Glenn, certainly was drinking heavily in that place."); *Trial Tr. Vol.

IV, at 47* ("You can use your own common sense as to what was actually going on in that

barroom on that night.  You can use your own common sense as to how much people were

drinking, and you can use your own common sense as to the level of intoxication of all those

parties on that night."); *Trial Tr. Vol. IV, at 48-49* ("But I'm going to suggest to you again, the Judge is really going to instruct you as to the words specific intent. Intent, real cognizance of that word and what it truly means, and really, I'm going to suggest to you, think of John Anderson and the amount of alcohol that he had on that particular night, and how the events occurred. Quickly, this argument, I'm going to suggest to you, in that barroom. Then the argument then ensued outside. Then the fight that occurred outside. . . . Think of the alcohol, I'm going to suggest to you, that they all had ingested. Think of the hour, all of those kind of things. I think if you do that, if you listen to the Judge's instructions, I think you will come to the resolution that John Anderson is not guilty of assault with intent to commit murder, and John Anderson is not guilty of mayhem."). *See also Trial Tr. Vol. II, at 91-92* (cross-examination by petitioner's trial counsel of Officer Kevin Hawes regarding petitioner's intoxication); *Trial Tr. Vol. II, at 113-114* (cross-examination by petitioner's trial counsel of Sergeant Brendan Durkin regarding petitioner's intoxication), *Trial Tr. Vol. II, at 119* (cross-examination by petitioner's trial counsel of Officer Daniel Kennedy regarding the petitioner's intoxication); *Trial Tr. Vol. III, at 133-136, 138-139* (cross-examination by petitioner's trial counsel of Rita Parks regarding petitioner's intoxication); *compare Trial Tr. Vols. I-IV.*

In Massachusetts, "Where an offense requires proof of specific intent and there is evidence 'tending to show' that the accused may have been intoxicated at the time of the offense, the judge, if requested, **must** instruct the jury to consider the defendant's intoxication in determining whether the Commonwealth has proved that specific intent beyond a reasonable doubt." Commonwealth v. Traylor, 43 Mass. App. Ct. 239, 243-244 (1997) (emphasis added) (citing and quoting Commonwealth v. Henson, 394 Mass. 584, 593 (1985)). The Supreme Judicial Court of Massachusetts identifies this as "the Henson rule". See, e.g., Commonwealth v.

Dilday, 409 Mass. 45, 47-48 (1991). If a trial judge is requested to instruct the jury to consider

the defendant's intoxication in determining whether the Commonwealth has proved specific

intent beyond a reasonable doubt, and if the evidence tends to show that the accused may have

been intoxicated at the time of the offense, then the trial judge **is required** to give such an

instruction. Traylor, supra, 43 Mass. App. Ct. at 243-244 (citing and quoting Henson, supra, 394

Mass. at 593). The question of whether an intoxication instruction is required turns on whether

the evidence suggests "'a condition of "debilitating intoxication" that could support a reasonable

doubt as to whether a defendant was capable of forming the requisite criminal intent.'" See

Commonwealth v. Erdely, 430 Mass. 149, 152 (1999) (quoting Commonwealth v. James, 424

Mass. 770, 789 (1997)) ("'Voluntary intoxication instructions are not required where the

evidence does not suggest a condition of "debilitating intoxication" that could support a

reasonable doubt as to whether a defendant was capable of forming the requisite criminal

intent.'"). See also Commonwealth v. LeBlanc, 433 Mass. 549, 556 (2001) (proper to instruct on

intoxication where "[t]he defendant drove two teenagers to a wooded area and bludgeoned them

to death" and "there was conflicting evidence as to the extent of his intoxication").

 The requirement that the instruction is to be given under the applicable circumstances is a

"rule". See, e.g., Commonwealth v. Dilday, supra, 409 Mass. at 47-48. Because there existed

strong evidence showing that petitioner was intoxicated at the time the charged offenses

allegedly occurred, *see, e.g., Trial Tr. Vol. II, at 81-82; Trial Tr. Vol. III, at 89-92,* it is at least

debatable that petitioner was entitled to a jury instruction which informed the jury that they were

permitted to consider evidence of the petitioner's intoxication in determining whether the

Commonwealth proved the specific intent required for the charge of mayhem beyond a

reasonable doubt. See Traylor, supra, 43 Mass. App. Ct. at 243-244; Henson, supra, 394 Mass.

at 593.  <u>See</u>  <u>Miller-El v. Cockrell</u>, <u>supra</u>, 537 U.S. at 338.

Additionally, because the principal defense offered by petitioner's trial counsel was that petitioner was unable to form the necessary specific intent due to his intoxication, and because the jury could have retained a reasonable doubt as whether petitioner had indeed formed the requisite specific intent given his intoxication, it is at least debatable that Attorney Busconi's failure to request such an instruction could only have been the result of a materially substandard performance.  *Compare Trial Tr. Vols. I-IV and Trial Tr. Vol. IV, at 37-49 with* <u>Traylor</u>, <u>supra</u>, 43 Mass. App. Ct. at 243-244; <u>Henson</u>, <u>supra</u>, 394 Mass. at 593; <u>LeBlanc</u>, <u>supra</u>, 433 Mass. at 556.  <u>See</u>  <u>Miller-El v. Cockrell</u>, <u>supra</u>, 537 U.S. at 338.

Accordingly, applying the clearly established law of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), with respect to Attorney Busconi's failure to request the trial judge to instruct the jury that they were permitted to consider evidence of the petitioner's intoxication in deciding whether the Commonwealth proved the specific intent element of mayhem beyond a reasonable doubt, and with respect to Attorney Busconi's failure to object to the trial judge's failure to give such an instruction, it is at least debatable that counsel's performance was deficient in that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment and that this deficient performance prejudiced the defense in that counsel's errors were so serious as to deprive the petitioner of a fair trial, a trial whose result is reliable. <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 390 (2000) (quoting <u>Strickland</u>, <u>supra</u>, 466 U.S. at 687); <u>see</u> <u>also</u> <u>Williams v. Taylor</u>, <u>supra</u>, 529 U.S. at 390-391 (quoting <u>Strickland</u>, <u>supra</u>, 466 U.S. at 688, 694).  <u>See</u>  <u>Miller-El v. Cockrell</u>, <u>supra</u>, 537 U.S. at 338.

Additionally, it is at least debatable that de novo review applies to this claim because the Appeals Court's decision failed to address either the Sixth Amendment or <u>Strickland</u>, <u>see</u>

Commonwealth v. Anderson, 58 Mass. App. Ct. 117 (2003).  See  Miller-El v. Cockrell, supra,

537 U.S. at 338.  As 28 U.S.C. § 2254 and Article III of the United States Constitution are

addressed to the power and the role of federal courts to address federal law, and not to

"functional equivalents" of federal law, see Williams v. Taylor, 529 U.S. at 378-379 (quoting

Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 177 (1803)); 28 U.S.C. § 2254; U.S. Const. art.

III, it is at least debatable that the Appeals Court's discussion of  the error and prejudice prongs

of the ineffectiveness analysis, see Anderson v. Nolan, U.S. District Court for the District of

Massachusetts, Civil Action No. 04-12355-RGS, Magistrate Judge Sorokin's Report and

Recommendation, issued on May 4, 2007, ("R&R"), at 7 n. 2, was insufficient to establish an

adjudication on the merits.  Thus, as the Appeals Court failed to address either the Sixth

Amendment or Strickland, see Commonwealth v. Anderson, supra, 58 Mass. App. Ct. 117, it is

at least debatable that petitioner's ineffective assistance of counsel claim under Strickland was

not adjudicated on the merits in a state court proceeding, and that said claim must therefore be

reviewed de novo.  See Norton v. Spencer, 351 F.3d 1, 4-5 (1st Cir. 2003), cert. denied, 542 U.S.

433 (2004).  See  Miller-El v. Cockrell, supra, 537 U.S. at 338.

In light of the foregoing, it is at least debatable that the Appeals Court's decision, in

which the Appeals Court failed to find that petitioner had been denied his Sixth Amendment

right to the effective assistance of counsel under Strickland, supra, by his trial counsel's failure

either to request the trial judge to instruct the jury that they were permitted to consider evidence

of the petitioner's intoxication in deciding whether the Commonwealth proved the specific intent

element of mayhem beyond a reasonable doubt, or to object to the trial judge's failure to give

such an instruction, constituted reversible error and was both contrary to clearly established

Federal law, as determined by the Supreme Court of the United States, and involved an

unreasonable application of clearly established Federal law, as determined by the Supreme Court

of the United States.  See 28 U.S.C. § 2254(d)(1).  See  Miller-El, supra, 537 U.S. at 338.

**II.  A COA should be granted because it is at least debatable that petitioner's claim of ineffective assistance of counsel based on his trial counsel's failure to file or litigate a motion to suppress statements  was not procedurally barred and in fact constituted ineffective assistance of counsel under Strickland.**

The District Court concluded that the refusal of the Appeals Court to reach petitioner's

claim of ineffective assistance of counsel based on the failure of his trial counsel to file or litigate

a motion to suppress statements rests on an independent and adequate state ground, see Anderson

v. Nolan, U.S. District Court for the District of Massachusetts, Civil Action No. 04-12355-RGS,

Memorandum and Order on Magistrate Judge's Report and Recommendation, dated June 26,

2007, at 1, i.e., that the claim was procedurally barred because the claim was raised for the first

time on direct appeal.  Compare R&R, at 9-11.

Under Massachusetts law, this claim was not procedurally barred.  In Massachusetts, "a

'claim of ineffective assistance may be resolved on direct appeal of the defendant's conviction

when the factual basis of the claim appears indisputably on the trial record.'"  See

Commonwealth v. Zinser, 446 Mass 807, 811 (2006) (quoting Commonwealth v. Adamides, 37

Mass. App. Ct. 339, 344 (1994)); but see Zinser, supra, 446 Mass. at 811 ("But this exception is

narrow." citing Commonwealth v. Anderson, supra, 58 Mass. App. Ct. at 124-125 n. 8 (referring

to the case that is the subject of the instant petition)).[1]  As indicated below, in this case, the

ineffective assistance of counsel in failing to file or litigate a motion to supress statements

appears indisputably on the trial record:

---

[1] Petitioner notes that the Supreme Judicial Court in Commonwealth v. Zinser, 446 Mass. 807 (2006) cites the case that is the subject of the instant petition, Zinser does not contain an analysis of the factual basis upon which petitioner is asserting that the claim at issue appears indisputably on the record.  See id.

Beginning at his arraignment on October 9, 1997, petitioner was represented by appointed counsel Joseph M. Shields, Esquire. *See Defendant's Record Appendix, at 41, 43.* Attorney Shields' representation of petitioner concluded on March 5, 1998. *See id., at 41, 44.* On March 5, 1998, the representation of petitioner was taken over by appointed counsel Michael J. Casey, Esquire. *See id.* Attorney Casey's representation of petitioner concluded on March 5, 1999. *See id., at 41, 46.* On March 5, 1999, the representation of petitioner was taken over by Frederick A. Busconi, Esquire, who served as petitioner's trial counsel. *See id., at 42, 46; Trial Tr. Vols. I-IV.* The Middlesex Superior Court docket for this case indicates that on March 2, 1998, a date of April 29, 1998, was set for a "Motion to Suppress", *Defendant's Record Appendix, at 44;* and on April 8, 1998, a date of May 21, 1998, was set for a "Motion to Suppress", *id.;* and on May 21, 1998, a continuance was ordered to June 10, 1998. *Id.*

Despite the fact that at trial the Commonwealth introduced evidence of statements allegedly made by petitioner while petitioner was in police custody, *see, e.g., Trial Tr. Vol. II, at 75-76, 79-85*, following petitioner's consumption of a significant amount of alcohol, *see Trial Tr. Vol. III, at 89, 90, 92, 139,* no motion to suppress was ever filed in this case. *See Defendant's Record Appendix, at 43-50; Trial Tr. Vol. II, at 80-81, 132-133.* When the Commonwealth sought to introduce testimony regarding petitioner's alleged statements, petitioner's trial counsel objected. *Trial Tr. Vol. II, at 80.*

The trial judge admitted into evidence the testimony of three different police officers as to statements allegedly made by petitioner while in police custody. *See Trial Tr. Vol. II, at 80, 82, 83-85* (testimony of Officer Kevin Hawes); *id. at 100-105* (testimony of Sergeant Brendan Durkin); *Trial Tr. Vol. III, at 14, 21, 23-26* (testimony of Sergeant Joseph Murray)). The substance of these alleged statements included the following: (1) that petitioner understood his

Miranda rights, agreed to speak with police, and agreed to accompany the police to the Criminal

Bureau, *Trial Tr. Vol. II, at 80, 100; Trial Tr. Vol. III, at 14*; (2) that as to a question regarding

his sobriety, petitioner felt fine, knew where he was, and knew what he was doing, *Trial Tr. Vol.*

*III, at 23*; (3) in response to a question as to whether he had been drinking, that petitioner had

two beers earlier in the night and that petitioner had not been using drugs, *id. at 21, 23*; (4) that

while inside Captain John's somebody had stolen, or attempted to steal Rita Parks' purse, and

that petitioner chased that person outside, and before petitioner could get to that person he was

attacked by a group of people he did not know, *Trial Tr. Vol. II, at 82, 100*; (5) alternatively, that

petitioner had been at Captain John's, and when they came out and they were walking away from

Cupples Square on Pine Street, two men ran up behind them and one of these men stole Rita

Parks' pocketbook, *Trial Tr. Vol. III, at 24*; (6) that petitioner had tackled one of the people

responsible for stealing Rita Parks' pocketbook and that the other person began to kick petitioner

and fight with petitioner and eventually the police showed up and arrested petitioner for some

unknown reason, *id.*; (7) that when asked to describe the individuals who stole his girlfriend's

pocketbook and with whom he had an altercation, petitioner could not describe them, *id. at 25*;

(8) that petitioner did not notice Mr. Tetrault until the police pointed him out, *Trial Tr. Vol. II, at*

*83*; (9) that the fight had occurred, and blood had been splashed on petitioner, on the side of the

Pine Street opposite from where a man observed to be severely injured lay on the sidewalk and

where blood was located, *Trial Tr. Vol. II, at 101-102*; (10) that petitioner hadn't been on the

side of the street where the severely injured man was located and that he didn't even know that

the other person who had been injured was lying until the police pointed it out to him, *id. at 103-*

*104*; (11) as to Mr. Tetrault (without having been told which side of the street Mr. Tetrault was

on) that petitioner "never had a beef" with Mr. Tetrault and that he was never on that side of the

street, and that he was never on the 16 Pine Street side of the street, *Trial Tr. Vol. III, at 24, 25*; (12) when told that he had not been told which side of the street Mr. Tetrault was on, that petitioner became angry and accused officers of putting words in his mouth, *Trial Tr. Vol. III, at 24-25*; (13) when told by an officer that he had already stated to another officer that the victim had taken Rita Parks' pocketbook and that it was the victim he had the initial problem with, and that he was going after the victim at the time he was jumped by other people and then arrested, petitioner got angry, called the officer a liar, and stated that he never even saw the victim, *id. at 26*; (14) that petitioner never even saw the victim, *id. at 25*; (15) that the blood on petitioner and on petitioner's sneakers must have happened in the fight with Mr. Quirbach and did happen during the fight with Mr. Quirbach, *Trial Tr. Vol. II, at 83-84*; (16) that while petitioner was fighting with the group that he didn't know, that he had been helped by Carl Quirbach, *Trial Tr. Vol. II, at 100, 105*; (17) an absence of response when asked why petitioner was fighting Carl Quirbach if Quirbach had been helping him, *id. at 105*; (18) that the blood on petitioner's sneakers, his legs, his shorts, and his shirt, was his own blood, *Trial Tr. Vol. III, at 25*; (19) that petitioner had gotten the blood on him in the fight with five or six men and pointed out the area of the street where the fight had occurred, *Trial Tr. Vol. II, at 101*; (20) with regard to the issue of whether the blood was fresh or old, that it must have happened during the fight, that it was old and he didn't know where it came from, and that the blood on petitioner was "old blood", *Trial Tr. Vol. II, at 84-85, 104*; (21) that neither petitioner nor his girlfriend had been involved in the fight, *Trial Tr. Vol. II, at 104-105*.

When the Commonwealth sought to introduce these statements, petitioner's trial counsel objected. *Trial Tr. Vol. II, at 80*. At sidebar, when asked by the trial judge whether there was a motion to suppress statements in this case, Attorney Busconi responded, "Again, Judge, I wasn't

here. It's part of my problem." *Trial Tr. Vol. II, at 80.* Subsequently, at sidebar, in response to

the trial judge's placing on the record the absence of a filed motion to suppress, Attorney

Busconi explained his lapse by stating, "I suspect –- You know, we all know that everybody

thought this case was going to be disposed of." *Trial Tr. Vol. II, at 132-133.*

During a sidebar conference regarding defense counsel's failure to file a motion to

suppress statements, the trial judge stated,

> I'm just saying if I had known that would have – that was going to be taking
> place, I would have done some other things before we even impaneled a jury,
> but from everything that I saw in the folder when I looked at it, nothing tipped
> me off that there was an issue about his statements to the police officers or
> anything like that. I'll make sure they understand that rule about considering his
> statements. **Because again, they may consider that he was too drunk to have**
> **voluntarily made those – or rationally made those statements**. . . .

*Trial Tr. Vol. II, at 133 (emphasis added)*

At the time the petitioner was in police custody at the car, Officer Hawes could detect an

odor of alcohol on the petitioner. *Trial Tr. Vol. II, at 81-82.* The petitioner had injuries to his

face. *Tr. Vol. III, at 31.* At the police station, it was observed that both of the petitioner's eyes

were swollen and his face was welted. *See Trial Tr. Vol. III, at 16, 33* (testimony of Sergeant

Joseph Murray, Lowell Police Department). The knuckles on both of the petitioner's hands were

scraped and appeared to have been bleeding. *Id. at 16.* The petitioner also had a scrape to the

area of one of his knees. *Id. at 34.* The petitioner "definitely had an injury to his nose." *Id. at*

*33.* The petitioner had injuries on his facial bones, most significantly in the area underneath

both eyes. *Id.*

Statements made in response to custodial police interrogation violate the Fifth

Amendment privilege against self-incrimination unless the defendant is advised that he has a

right to remain silent; that any statement he makes will be used as evidence against him; that he

has a right to the presence of an attorney during questioning; and that if he cannot afford an attorney one will be appointed for him during questioning. Miranda v. Arizona, 384 U.S. 436 (1966). "[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980). In Massachusetts, the prosecution must prove beyond a reasonable doubt a knowing, intelligent, and voluntary waiver of Miranda rights. Commonwealth v. Day, 387 Mass. 915, 921 (1983). The prosecution must also prove beyond a reasonable doubt that the statement was voluntary under due process. Commonwealth v. Tavares, 385 Mass. 140, 151-152 (1982) (citing Jackson v. Denno, 378 U.S. 368 (1964)), cert. denied, 457 U.S. 1137 (1982).

In Massachusetts, when the prosecution seeks to introduce an alleged inculpatory statement or confession of a criminal defendant, "'humane practice'" requires that the question of whether the statement or confession was voluntary is to be decided at a preliminary hearing in the absence of a jury. See Commonwealth v. Tavares, supra, 385 Mass. at 149-150 (quoting Commonwealth v. Marshall, 338 Mass. 460, 461-462 (1959)). Further, in Massachusetts, statements made while under the influence of or the withdrawal from alcohol or drugs have been held to be involuntary. Commonwealth v. Meehan, 377 Mass. 552, 565-568 (1979).

As the record makes clear, there exists a substantial likelihood that petitioner was too intoxicated and physically injured to make a voluntary, knowing and intelligent waiver of his Miranda rights or to make statements to the police that were voluntary under due process. *See Trial Tr. Vol. II, at 81-81; Trial Tr. Vol. III, at 16, 31, 33, 87, 90-92, 151.*

Notwithstanding the weight of the evidence placed in the record by petitioner's trial counsel indicating that the omissions were not strategic, the R&R determines erroneously that the failure of petitioner's trial counsel to file or litigate a motion to suppress statements may have

14

been the result of a strategic decision by petitioner's trial counsel.  <u>See</u> R&R, at 11 n. 6.  This

determination by the R&R indicates not simply a misunderstanding of the record but in fact

overlooks the plain evidence in the record, as it is clear from the record that the failure of

petitioner's trial counsel to file or litigate a motion to suppress statements was a non-strategic,

inadvertent error constituting substandard performance: As noted above, when the

Commonwealth sought to introduce testimony regarding petitioner's alleged statements,

petitioner's trial counsel objected.  *Trial Tr. Vol. 2, at 80.*  Further, at sidebar, when asked by the

trial judge whether there was a motion to suppress statements in this case, Attorney Busconi

responded, "Again, Judge, I wasn't here.  It's part of my problem." *Id.*  Subsequently, at sidebar,

in response to the trial judge's placing on the record the absence of a filed motion to suppress,

Attorney Busconi explained his lapse by stating, "I suspect –- You know, we all know that

everybody thought this case was going to be disposed of."  *Trial Tr. Vol. II, at 132-133.*

　　　　Accordingly, and because the volume and inculpatory nature of the alleged statements,

described <u>supra</u>, make it clear that the admission of these statements was materially prejudicial to

the petitioner, *see Trial Tr. Vol. II, at 80, 100; Trial Tr. Vol. III, at 14*; *Trial Tr. Vol. III, at 23*; *id.*

*at 21, 23*; *Trial Tr. Vol. II, at 82, 100*; *Trial Tr. Vol. III, at 24*; *id.*; *id. at 25*; *Trial Tr. Vol. II, at*

*83*; *Trial Tr. Vol. II, at 101-102*; *id. at 103-104*; *Trial Tr. Vol. III, at 24, 25*; *Trial Tr. Vol. III, at*

*24-25*; *id. at 26*; *id. at 25*; *Trial Tr. Vol. II, at 83-84*; *Trial Tr. Vol. II, at 100, 105*; *id. at 105*;

*Trial Tr. Vol. III, at 25*; *Trial Tr. Vol. II, at 101*; *Trial Tr. Vol. II, at 84-85, 104*; *Trial Tr. Vol. II,*

*at 104-105*, applying the clearly established law of <u>Strickland v. Washington</u>, <u>supra</u>, with respect

to Attorney Busconi's failure to file or litigate a motion to suppress the statements allegedly

made by petitioner while in police custody, it is at least debatable that counsel's performance

was deficient in that counsel made errors so serious that counsel was not functioning as the

counsel guaranteed by the Sixth Amendment and that this deficient performance prejudiced the defense in that counsel's errors were so serious as to deprive the petitioner of a fair trial, a trial whose result is reliable.  See Williams v. Taylor, supra, 529 U.S. at 390 (quoting Strickland v. Washington, supra, 466 U.S. at 687) (as quoted above); see also Williams v. Taylor, supra, 529 U.S. at 390-391 (quoting Strickland, supra, 466 U.S. at 688, 694) (as quoted above).  See Miller-El v. Cockrell, supra, 537 U.S. at 338.

In light of the foregoing, whether the issue is reviewed de novo or under 28 U.S.C. § 2254(d), it is at least debatable that the Appeals Court's decision, in which the Appeals Court failed to find that petitioner had been denied his Sixth Amendment right to the effective assistance of counsel under Strickland v. Washington, supra, by his trial counsel's failure to file or litigate a motion to suppress the statements allegedly made by petitioner while in police custody, constituted reversible error and was both contrary to clearly established Federal law, as determined by the Supreme Court of the United States, and involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.  See 28 U.S.C. § 2254(d)(1).

**III.  A COA should be granted because it is at least debatable that the Appeals Court addressed petitioner's intoxication jury instruction claim in such a manner as to effectively apply a conclusive presumption of specific intent in violation of the Due Process Clause of the Fourteenth Amendment.**

Petitioner timely appealed his convictions to the Massachusetts Appeals Court, *see Defendant's Record Appendix, at R. A. 40, 49*, addressing, *inter alia*, multiple claims of ineffective assistance of counsel under the Sixth Amendment and under Massachusetts law, *see Defendant*'s *Brief, at 11-42*, including a claim of ineffective assistance of counsel based on trial counsel's failure to request the trial judge to instruct the jury that they were permitted to consider

evidence of the petitioner's intoxication in deciding whether the Commonwealth proved beyond a reasonable doubt the specific intent element of mayhem, i.e., "the specific intent to maim or disfigure", see *Trial Tr. Vol. IV, at 75; Mass. Gen. L. c. 265, § 14. See Defendant's Brief, at 11-16.*  Petitioner also argued, *inter alia*, that the petitioner's convictions should be reversed because of the trial judge's failure to instruct the jury *sua sponte* that they were permitted to consider evidence of petitioner's intoxication in deciding whether the Commonwealth proved the specific intent element of mayhem beyond a reasonable doubt.  *Defendant's Brief, at 42-45.*

Having "pause[d] in consideration of the amount of beer consumed by the petitioner throughout the evening", Commonwealth v. Anderson, *supra*, 58 Mass. App. Ct. at 122, 122 n. 4, the Appeals Court, "assume[d] hypothetically that an intoxication instruction was warranted." Id. at 122.  The Appeals Court "further assume[d] hypothetically that omission of such an instruction was either the result of ineffective assistance of counsel, or unobjected-to judicial error."  Id.  Notwithstanding these assumptions, the Appeals Court determined, "we are not persuaded that, had such an instruction been given, it would have materially influenced the guilty verdict, or been of such effect, when applied to the trial evidence, to render it inferentially plausible that the jury's verdict on the mayhem charge would have been different."  Id.  The Appeals Court based this determination on (1) "evidence that, notwithstanding his alcohol consumption, the petitioner remained in control of his faculties – a cognitive affect from which a jury could further conclude that the petitioner was capable of forming the requisite specific intent to commit mayhem", Commonwealth v. Anderson, supra, 58 Mass. App. Ct. at 123; (2) "the brutal nature of the assault", id. at 123; (3) "the severity of the resulting injuries", id.; and (4) the fact "that the trial judge twice instructed the jury concerning the requirement of finding specific intent as an element of proof on the mayhem offense, first at the beginning of the case and

second in the final charge." Id.  The Appeals Court emphasized the severity of the alleged

assault and the resulting injuries.  Id. at 123-124.  The Appeals Court did not conclude that the

evidence demonstrated that an intoxication instruction was not warranted.  See id., 58 Mass.

App. Ct. 117.  Rather, as indicated supra, the Appeals Court "assume[d] hypothetically that an

intoxication instruction was warranted."  Id. at 122; see id. at 121-124.

As petitioner's application to the Supreme Judicial Court of Massachusetts for further

appellate review was denied, see Commonwealth v. Anderson, 439 Mass. 1108 (2003),

petitioner's federal claim, that the Appeals Court in Commonwealth v. Anderson, supra, 58

Mass. App. Ct. 117, had effectively applied a conclusive presumption of the specific intent to

maim or disfigure in violation of the Due Process Clause of the Fourteenth Amendment to the

United States Constitution, was not adjudicated on the merits in a state court proceeding.

Accordingly, the issue is reviewed de novo.  See Norton v. Spencer, supra, 351 F.3d at 4-5.

The Appeals Court effectively held that an instruction to the jury to consider the

petitioner's intoxication in determining whether he had the capacity to formulate the specific

intent to maim or disfigure was not required in this case because the nature and cause of the

injuries sustained by the victim constituted evidence sufficient for a finding that the petitioner

formed the specific intent to maim or disfigure.  See Commonwealth v. Anderson, supra, 58

Mass. App. Ct. at 122-124 (finding conclusive evidence of specific intent based on "the brutal

nature of the assault" (citing Commonwealth v. Hamm, 19 Mass. App. Ct. 72, 80, review denied,

397 Mass. 1101 (1984)), and based on the principle that "'[s]pecific intent may be inferred from

the nature of the injuries as well as evidence that "the injuries arose from a sustained or atrocious

attack."'" (quoting Commonwealth v. Sparks, 42 Mass. App. Ct. 915, 916 (1997) (quoting

Commonwealth v. Cleary, 41 Mass. App. Ct. 214, 217 (1996)); also citing and quoting accord

18

Commonwealth v. Doucette, 391 Mass. 443, 456 (1984)).

"'[T]he trial court may not withdraw or prejudge an issue by instruction that the law raises a presumption of intent from an act.'" Sandstrom v. Montana, 442 U.S. 510, 521-522 (1979) (quoting Morissette v. United States, 342 U.S. 246, 274-275 (1952) (emphasis in Sandstrom)). "'A conclusive presumption which testimony could not overthrow would effectively eliminate intent as an ingredient of the offense.'" Sandstrom, supra, 442 U.S. at 522 (quoting Morissette, supra, 342 U.S. at 274-275 (emphasis in Sandstrom). A conclusive presumption violates due process by eliminating the requirement that the State "prove 'beyond a reasonable doubt . . . every fact necessary to constitute the crime . . . charged'". Sandstrom, supra, 442 U.S. at 520, 523 (citing and quoting In re Winship, 397 U.S. 358, 364 (1970)). See also Sandstrom, supra, 442 U.S. at 524; Winship, supra, 397 U.S. at 364).

The United States Supreme Court in Sandstrom v. Montana, supra, explains the constitutional deficiency of the conclusive presumption with reference to the prior cases of Morissette v. United States, supra, and United States v. United States Gypsum Co., 438 U.S. 422 (1978). See Sandstrom, supra, 442 U.S. at 520-523. The Court noted that in Morissette, where the defendant was charged with willful and knowing theft of government property, the trial judge erred by ruling that felonious intent "is presumed by [the defendant's] own act." Sandstrom, supra, 442 U.S. at 521-522 (citing and quoting Morissette, supra, 342 U.S. at 249, 273-275). The Court further noted that in United States v. United States Gypsum Co., supra, where the defendants were charged with violations of the Sherman Act, the trial judge erred by instructing the jury that, inter alia, "if the effect on the exchanges of pricing information was to raise, fix, maintain, and stabilize prices, then the parties to them are presumed, as a matter of law, to have intended that result." Sandstrom, supra, 442 U.S. at 522-523 (citing and quoting United States

19

Gypsum Co., supra, 438 U.S. at 430, 435, 446).  The Sandstrom Court approved the results in

Morissette and United States Gypsum Co. as standing for the principle that "a conclusive

presumption . . . would 'conflict with the overriding presumption of innocence with which the

law endows the accused and which extends to every element of the crime,' and would 'invade

[the] factfinding function' which in a criminal case the law assigns solely to the jury."

Sandstrom v. Montana, supra, 442 U.S. at 523.

Accordingly, it is at least debatable that, by taking from the jury the issue of whether the

petitioner's intoxication diminished the petitioner's capacity to form the required specific intent,

the Appeals Court violated due process under the Fourteenth Amendment.  See Sandstrom v.

Montana, supra, 442 U.S. at 520-523; see also Sandstrom, supra, 442 U.S. at 524; Winship,

supra, 397 U.S. at 364; compare Trial Tr. Vol. III, at 88-92, 139, 144 (at some time subsequent

to 4:30 or 5:00 p.m., the petitioner consumed up to 12 beer drinks plus, possibly, an additional

amount of beer from a pitcher of beer sent over by a friend of the petitioner).  See Miller-El,

supra, 537 U.S. at 338.

In light of the foregoing, whether the issue is reviewed de novo or under 28 U.S.C. §

2254(d), it is at least debatable that, applying the clearly established Federal law of Sandstrom v.

Montana, supra, and In re Winship, supra, the Appeals Court's effective application of a

conclusive presumption of the specific intent to maim or disfigure constituted reversible error

and was both contrary to clearly established Federal law, as determined by the Supreme Court of

the United States, and involved an unreasonable application of clearly established Federal law, as

determined by the Supreme Court of the United States.  See 28 U.S.C. § 2254(d)(1).  See Miller-

El, supra, 537 U.S. at 338.

Respectfully submitted,

20

JOHN ANDERSON
By his Attorney,

/s/ David H. Mirsky
David H. Mirsky, Esquire
(MA B.B.O. # 559367)
Mirsky & Petito
Attorneys at Law
P.O. Box 1063
Exeter, NH 03833
Tel. 603-773-2199
davidmirsky@earthlink.net

Dated: July 19, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 19, 2007, including Eva M. Badway, Assistant Attorney General, counsel for the respondents David Nolan et al., in this matter.  There are no non-registered participants involved in this case.

/s/ David H. Mirsky
David H. Mirsky, Esquire